EDWARD F. TREGO, Trustee, Plaintiff in Error, *vs.* THE
ESTATE OF JAMES A. CUNNINGHAM, Deceased, *et al.*
Defendants in Error.

*Opinion filed February 17, 1915—Rehearing denied April 9, 1915.*

1. CONTRIBUTION—*general rule as to contribution from sureties.*
Where there are sureties for the same principal debtor and for the
same debt or obligation, and one or more of them have paid or
satisfied more than his or their proportionate share of the debt or
obligation, he or they are entitled to contribution from the other
sureties in order to equalize the common burden.

2. SAME—*the doctrine of contribution originated with courts
of equity.* The right to contribution is based on the principles of
equity and natural justice, and although contribution may be en-
forced in a court of law on the theory of an implied contract, the
doctrine originated with courts of equity and they still have ju-
risdiction.

3. SAME—*court of equity will apportion loss among the solvent
sureties.* The contract implied by law when one becomes a surety
is that he engages to contribute his proportion according to the
number of the sureties, without reference to the solvency or in-
solvency of either of his co-sureties, but a court of equity, apply-
ing the fundamental rule that equality is equity, will apportion the
loss among the solvent sureties.

4. COURTS—*what calls for exercise of equitable jurisdiction by
probate court.* Where a claimant against an estate in the probate
court alleges the insolvency of the principal maker of notes on
which the deceased was surety and of certain of the sureties and
asks for contribution from the estate to the other sureties who
have paid the notes, an exercise of equitable powers by the pro-
bate court is called for, and that court will proceed as though a
bill in chancery had been filed, and will hear evidence, investigate
the claim and apply equitable rules in determining the judgment.

5. SAME—*section 60 of Administration act, relating to trial by
jury, construed.* The provision of section 60 of the Administra-
tion act with reference to the right to demand a jury of six or
twelve men to try the issue, has reference to such claims as would
give rise to an action at law and not to claims which call upon
the probate court for the same relief, upon the same equitable
principles, as would be the case had a bill in chancery been filed.

6. SAME—*when provision of statute as to propositions of law
does not apply.* In a case calling for the exercise by the probate

court of purely equitable jurisdiction the court will act substantially as a court of equity, disregarding mere matters of form and looking to the substance to determine the rights of the parties, and in such case there is no right to a jury trial, and, in consequence, the statutory provision for propositions of law does not apply.

7. BILLS AND NOTES—*when equity will not hold that giving a new note paid the old one.* Although the giving of a new note is *prima facie* payment of the old one, yet the probate court, administering rules of equity, will not hold that an insolvent corporation doing a losing business, with liabilities several times its assets, paid its debt by exchanging for its old note a new one having the same indorsers except one, who was dead; and the fact that the estate of the deceased indorser may be discharged from liability to the creditor does not preclude requiring contribution from his estate to the solvent indorsers, who subsequently paid the new note.

8. SAME—*placing a note in the mail, addressed to the payee, constitutes a delivery.* Where the parties are at a distance from each other, placing a note in the mail, addressed to the payee, constitutes a delivery of the note, and if an indorser was living on the day the note was so deposited and the authority of the agent mailing the note to make use of notes bearing the indorsement is proved, it is not incumbent upon one asserting a claim against the indorser's estate to prove that the indorser was alive at the time of day the agent deposited the note in the mail.

9. SAME—*when contribution cannot be compelled.* Contribution by the estate of a deceased indorser of the notes of a corporation cannot be compelled by co-sureties as to such of the notes as are not clearly shown to have been paid by them, but which, under the evidence, may have been paid by the corporation, as the burden of proving payment by the co-sureties is upon the trustee acting in their behalf in seeking contribution.

10. SAME—*what does not affect right to compel contribution.* The right to compel contribution from the estate of a deceased indorser on the note of a corporation is not affected by the fact that after the death of such indorser the other indorsers executed notes as principal makers with which they took up the notes of the corporation, upon which all the parties were indorsers, which new notes were subsequently paid by the surviving solvent indorsers.

11. SAME—*effect of section 68 of Negotiable Instruments act.* Section 68 of the Negotiable Instruments act, which provides that, as respects one another, indorsers are liable, *prima facie,* in the order in which they indorsed but that evidence is admissible to show that as between or among themselves they have agreed otherwise, merely applies to all notes the doctrine which formerly applied in this State to notes payable to the order of the maker, that the

person writing his name on it in blank undertook the obligation of a second indorser.

12. SAME—*when order in which indorsers sign is not conclusive.* Where the indorsers of the notes of a corporation made payable to its own order constitute the entire body of the stockholders of the corporation and are also its directors, and the indorsement is for the benefit of all in keeping the corporation running, the order in which the names are signed is not conclusive in determining the right of those indorsers who were obliged to pay the note to contribution from the estate of a deceased indorser.

13. SAME—*verbal agreement of indorsers to be equally liable need not be proved.* Section 68 of the Negotiable Instruments act, providing that, as respects one another, indorsers are liable, *prima facie,* in the order in which they indorsed but evidence is admissible to show that as among themselves they have agreed otherwise, does not require that a verbal agreement that the indorsers shall be equally liable be proved but an inference of such agreement may be otherwise established.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Vermilion county; the Hon. E. R. E. KIMBROUGH, Judge, presiding.

J. B. MANN, H. M. STEELY, and H. M. STEELY, JR., for plaintiff in error.

FRANK LINDLEY, J. H. DYER, and G. F. REARICK, for defendants in error.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Plaintiff in error, Edward F. Trego, trustee for the use of William Moore and Alfred H. Trego, filed in the probate court of Vermilion county two claims against defendant in error, the estate of James A. Cunningham, deceased, for contribution to the amounts alleged to have been paid by the claimant on notes made by the Hoopeston Horse Nail Company, a corporation, payable to itself, and indorsed by the corporation and James A. Cunningham, William

267 – 24

Moore, Alfred H. Trego, John L. Hamilton, C. S. Crary and W. W. Todd. The first claim was for $110,601.58 for one-third of seventy-six notes alleged to have been paid, amounting, with interest from the time of payment, to $331,804.76. The second claim was for $2017.61, one-third of four notes aggregating $6052.84. It was alleged that the indorsers C. S. Crary, W. W. Todd and John L. Hamilton were insolvent and that the whole amount of the notes was paid with money furnished by William Moore and Alfred H. Trego. The probate court heard the evidence and allowed the first claim at $81,406.07 and the second at $1033.33. Each party appealed to the circuit court, where the causes were consolidated, and on a hearing judgment was rendered for $47,626.46 as of the seventh class, to be paid in due course of administration. Each party appealed to the Appellate Court for the Third District and they filed a joint bill of exceptions. The claimant assigned errors on the record and defendant assigned cross-errors. The judgment of the circuit court was affirmed by the Appellate Court, and each party petitioned this court for a writ of *certiorari* to bring the record here for review. The writ was awarded, and the plaintiff in error has assigned errors and the defendant in error has assigned cross-errors.

The Hoopeston Horse Nail Company was a corporation engaged in the manufacture and sale at Hoopeston, Illinois, of horseshoe nails and the sale of hoof-pads and some other articles. William Moore, Alfred H. Trego, James A. Cunningham, John L. Hamilton, C. S. Crary and W. W. Todd were the stockholders, owning all the stock, and were the directors. Cunningham was accidentally killed in Montana on January 11, 1910, and at that time the corporation, Hamilton, Crary and Todd were insolvent and have ever since been insolvent. The corporation had been enabled to do business by borrowing money wherever a bank would discount its notes indorsed by said parties who were stockholders and directors, and the notes were

held at numerous places in this State and Indiana. The practice had been to make a large number of notes of the corporation payable to its own order, leaving the date and amount blank, and the notes were indorsed and left with Todd, the manager of the corporation, to be filled up and used as occasion required. When it was necessary to obtain money to pay or renew a note that matured, one of the notes would be filled up by Todd and used to renew the maturing note, if a party would take it, or to be discounted for money to make payment. At the date of Cunning-ham's death his name appeared as indorser, with the other five stockholders, on eighty notes, for sums aggregating $315,318.23. The notes were in the following form:

"$5000.00                    HOOPESTON, ILL., *July 16, 1909.*

"Six months after date, we, or either of us, promise to pay to the order of ourselves five thousand and no/100 dollars, value received, with interest at seven per cent per annum from maturity, payable annually at Hoopeston National Bank, Hoopeston, Illinois.

HOOPESTON HORSE NAIL COMPANY, (Seal)
By A. H. Trego, *Pres.* (Seal)"

Indorsed as follows:

"HOOPESTON HORSE NAIL COMPANY,
By A. H. Trego, *Pres.*

C. S. Crary, William Moore, A. H. Trego, John L. Hamilton, J. A. Cunningham, W. W. Todd."

Upon learning of Cunningham's death the corporation sent out a circular letter to all the holders of its notes stating the fact of his death; that in the future it would be necessary for the corporation to put out its paper without his indorsement, and that he was worth approximately $500,000 and the other indorsers approximately $1,500,-000, and asking the creditor to accept new notes of the corporation indorsed by the remaining five. All of the notes on which Cunningham's name appeared as indorser were afterward taken up and retired. Notes were coming due within a few days after the death of Cunningham, and six of them, amounting to $27,500, were taken up from January 13 to January 17, 1910. During that brief period after

his death the same methods were pursued as before, except that he was not an indorser. Notes were made indorsed by the remaining five and were accepted by the creditors in place of those taken up. The new notes were rejected by the circuit court as constituting payments by the corporation of its own notes and not payments by the indorsers. There were ten notes, aggregating $40,500, as to which the book-keeper said he could not be certain where the funds came from with which the notes were paid,—whether they were discharged out of cash on hand or receipts from the business or in what manner. These notes were rejected by the circuit court. There was a note for $2500, on which Cunningham was indorser, which was filled up and mailed at Hoopeston to the Citizens' Bank of Peotone on the day of his death. It was dated January 12, 1910, and was received and discounted by the bank on January 12. The circuit court rejected this note on the ground that Cunningham's death put an end to any agency of Todd to fill up and deliver the note. The remaining notes of the corporation outstanding at the death of Cunningham and upon which he was an indorser were taken up with notes, or the proceeds of notes, executed by the five surviving indorsers as principal makers, on which the name of the corporation did not appear. These notes are called by the counsel "joint notes," and they were made out in blank and signed by the five remaining indorsers and left with Todd to be used in taking up the notes on which Cunningham's name appeared as an indorser. If the holder of one of the notes would accept a joint note Todd would fill up one and give it to him. If he would not accept the note of the individuals the money was borrowed elsewhere on one of the notes filled up by Todd and he was paid. Most of the notes were taken up in that way, but William Moore and Alfred H. Trego furnished cash to pay some of them. They had a plan of doing the business by which the proceeds of joint notes were deposited

to the credit of the corporation and the corporation made its check to the trustee and the trustee gave his check to the creditor, but the method by which it was done is of no importance if the fact was that William Moore and Alfred H. Trego in the end furnished the money that paid and satisfied the obligations. The circuit court took an account of all these seventy-three notes, the principal of which amounted to $247,818.23. The interest to April 18, 1913, was $37,940.58, making a total of $285,758.81. The claimant offered, and the circuit court held, propositions stating the law to be that the loss must be apportioned among the solvent indorsers and that each should bear one-third part thereof, with interest, but the court did not follow the law as so declared but divided the amount by six, and thereby reached the sum of $47,626.46, for which judgment was rendered.

Where there are sureties for the same principal debtor and for the same debt or obligation and one or some of them have paid or satisfied more than his or their proportionate share of the debt or obligation, he or they are entitled to contribution from the other sureties in order to equalize the common burden. The right to contribution is based on the principles of equity and natural justice, and although contribution may be enforced in a court of law on the theory of an implied contract, the doctrine originated with courts of equity and they still have jurisdiction. The contract implied by law when one becomes a surety is that he engages to contribute his proportion according to the number of sureties, without reference to the solvency or insolvency of either of his co-sureties, but a court of equity, applying the fundamental rule that equality is equity, will apportion the loss among the solvent sureties. (*Sloo* v. *Pool,* 15 Ill. 47; 1 Story's Eq. sec. 486; 1 Parsons on Contracts,—5th ed.—35.) The claimant alleged the insolvency of the principal maker and of the sureties C. S. Crary, W. W. Todd and John L. Hamilton, and asked for

contribution of one-third of the amounts of the notes, with interest from the time of payment. That was an appeal to the equitable powers of the probate court, and that court, although without general chancery jurisdiction, has equitable jurisdiction in the settlement and allowance of claims. To avoid the delay, expense and embarrassment in the settlement of estates by requiring a resort, in the first place, to a court of equity, it will proceed in a case of an equitable character as though a bill in chancery has been filed, and will hear the evidence, investigate the claim and apply equitable rules in determining the judgment. (*Moore* v. *Rogers,* 19 Ill. 347; *Dixon* v. *Buell,* 21 id. 203; *Heward* v. *Slagle,* 52 id. 336; *Wadsworth* v. *Connell,* 104 id. 369; *Thomson* v. *Black,* 200 id. 465.) In such a case the court will act substantially as a court of equity, disregarding mere matters of form and looking to the substance to determine the equities of the parties. Section 60 of the Administration act provides for filing claims against estates, and that on objection to the claim the case shall be tried as other suits at law and either party may demand a jury of six or twelve men to try the issue. Evidently the General Assembly had in mind such claims as would give rise to an action at law which should be tried as other suits at law, and could not have intended that such proceedings as the settlement of accounts of deceased guardians, executors, administrators or trustees, or rights enforceable in equity, although presented in the form of claims against estates, should be tried by jury. This suit was, in substance, a proceeding in chancery which might have been prosecuted in a court of chancery, where there would be no trial by a jury, and the probate court, when called upon to grant the same relief upon the same equitable principles, would properly adopt the same procedure. It was not intended that a suit begun in one court should be tried by a jury and if begun in another court should be tried by the court alone. There was, therefore, no right to a jury trial,

and section 61 of the Practice act, permitting a party to submit to the court written propositions of law, did not apply. Such propositions may be submitted only where a right to a jury trial exists and has been waived, and are for the purpose of making the record show the principles of law applied to the decision of the case. (*Moore* v. *Tierney,* 100 Ill. 207; *Martin* v. *Martin,* 170 id. 18; *Cody* v. *Town of Cicero,* 203 id. 322; *People* v. *Chicago, Burlington and Quincy Railroad Co.* 231 id. 112.) Both parties recognize the fact that this was not a suit at law but was, in substance, a proceeding in equity, by arguing the facts to the court and admitting the power of the court to review them. No attention, therefore, will be given to the supposed propositions of law. The record substantially shows, and the counsel are agreed, that the court did not apply the rules stated in the propositions but allowed only one-sixth of the amount of the seventy-three notes, with interest.

As to the six notes paid from January 13 to January 17, 1910, immediately after the death of Cunningham, it is contended that the corporation, as principal debtor, simply gave new notes with new indorsers, the legal effect of which was to discharge its own debt, and if the notes so given were ultimately paid by Moore and Trego that fact gave no right to contribution. The giving of a new note is *prima facie* payment of the original debt. (*Smalley* v. *Edey,* 19 Ill. 207; *Leake* v. *Brown,* 43 id. 372.) In this case the creditor gave up an old note of the corporation having six indorsers and took a new note with the same indorsers except Cunningham, who was dead. The first note on which Cunningham was an indorser was surrendered and an action could not have been brought upon it by the creditor. (*Yates* v. *Valentine,* 71 Ill. 643.) The estate of Cunningham was discharged, but that fact does not determine the question of a right to contribution for the money actually paid by his co-sureties. Courts of equity look to the substance and not to the form of any transac-

tion, and, as a matter of fact, the indorsers for the insolvent corporation, instead of making payment in cash, carried the obligations by giving new notes. The name of the corporation gave no value to the note and no creditor would have taken its note for any sum whatever. No one would have thought for a moment that the insolvent corporation would be able to or would pay, the new notes, and the remaining indorsers were merely obtaining extensions of debts which they would certainly be required to pay. There is no equity in the claim that the insolvent corporation paid its debts by giving new notes on which the only responsible parties were the indorsers. Although the giving of a new note is *prima facie* payment of an old one, a court administering the rules of equity would not say that an insolvent corporation doing a losing business, with liabilities three times its assets, paid its debt by the renewal of a note with the same indorsers except one, who was dead. The new notes were simply made as a method of carrying the obligation until the solvent sureties could pay, and the court erred in excluding those notes.

The note for $2500 had been given to Todd to raise money, and it was deposited in the post-office at Hoopeston, directed to the Citizens' Bank of Peotone, on January 11, the day that Cunningham was killed. Where the parties are at a distance from each other, placing a note in the mail, addressed to the payee, constitutes a delivery of the note. (1 Daniel on Neg. Inst. sec. 67; *Canterbury* v. *Town of Sparta,* 91 Wis. 53; *Barrett* v. *Dodge,* 16 R. I. 740; 3 Ruling Case Law, 860; *Burr* v. *Beckler,* 264 Ill. 230.) It is argued that the court was right in rejecting that note because the claimant did not prove that Cunningham was living at the time of the day when the note was deposited in the mail. The claimant proved the agency and it was presumed to continue until the contrary was shown. Ordinarily the law takes no note of fractions of a day and Cunningham was alive on January 11, but if any question as

to an hour of the day involving the difference of standard time or the actual time between Hoopeston and Montana could affect the case, it was for the defendant to make the proof. That note was improperly excluded.

The book-keeper was uncertain as to the source from which the ten notes amounting to $40,500 were paid. There was cash on hand in the bank and accounts receivable and the corporation continued to do business and borrowed some money, so that it was not impossible that the notes were paid by the corporation. The burden was upon the claimant to prove payment by the beneficiaries, and the court did not err in excluding those notes.

The court allowed one-sixth of the remaining seventy-three notes, with interest, instead of one-third, as claimed. The mere fact that the indorsers aided the corporation with credit, by which it was able to take up its outstanding paper, would give no right to any equity of contribution, and it is insisted that such was the fact, based mainly on the method adopted for doing the business by which the proceeds of the joint notes made by the five indorsers, and not by the corporation, were deposited in the name of the corporation, which gave its check to the trustee and the trustee gave his check to the creditor. As already stated, that method is of no importance in determining the rights of the parties as to money actually paid by Moore and Trego.

A claim much insisted upon in argument is based on section 68 of the Negotiable Instruments law, (Laws of 1907, p. 402,) which provides that, as respects one another, indorsers are liable *prima facie* in the order in which they indorsed, but evidence is admissible to show that as between or among themselves they have agreed otherwise. There was no regular order in which the indorsers signed the different notes, but in all of them Cunningham's name appeared below that of one of the beneficiaries. As applied to notes like those in question here, payable to the order

of the maker, the law of this State was the same before the Negotiable Instruments act was passed. Where a note was payable to the order of the maker and created no obligation until indorsed by him, the person writing his name on it in blank undertook the obligation of a second indorser. (*Blatchford* v. *Milliken,* 35 Ill. 434.) The rule was otherwise as to a note payable to another party, and the Negotiable Instruments act extended the same rule to all notes in accordance with the prevailing doctrine. (3 Ruling Case Law, sec. 348.) That act contemplates proof of an understanding between indorsers that their liability shall be joint, and not as implied from the order in which their names appear. Both by the terms of the act and the settled law the rule excluding parol evidence to vary a writing has no application. Where one not the payee placed his name on the back of a note parol evidence was always admissible to show what liability was in fact assumed. (*Kingsland* v. *Koeppe,* 137 Ill. 344.) In case of an indorsement in blank the established rule has been that resort might be had to parol evidence and the circumstances of the case to prove the true relation. (*Cook* v. *Brown,* 62 Mich. 473.) Of course, it is not essential that a verbal agreement that the indorsers should be equally liable should be proved, but an inference of such an agreement may be otherwise established. The understanding of the parties in that regard may be proved like any other fact, by the circumstances surrounding them. In this case the indorsers constituted the entire body of stockholders of the corporation, of which they were also directors, and to keep the corporation running it was necessary for them to indorse notes. It would be quite unreasonable to say that there was any intention that their liability should be determined by the order in which they indorsed the notes or that they expected to sue each other in that order. The notes were made for their benefit equally, to raise money for the corporation, whose assets and property belonged to them. The

court did not err in including those notes but did err in only allowing one-sixth of the amounts.

It is urged that the insolvent indorsers should have been made parties because the estate might have some claim against them. No suggestion, however, is made of any method by which the estate could set off any such claim if it had one, and the objection does not appear to have been raised in the trial court.

In the Appellate Court there were nine assignments of error by the claimant covering all the rulings and the finding and judgment, the fifth being that the finding and judgment were contrary to and against the evidence, the seventh that the court erred in dividing the liability by six instead of three, and the ninth that the court erred in not entering judgment for $95,252.92. It is contended that on account of the ninth assignment of error the entire claim is limited to the amount therein stated, but it appears that the ninth assignment related to the refusal of the court to divide the amount of the seventy-three notes, and interest, by three instead of six, in accordance with the proposition that the solvent indorsers should each bear one-third of the loss, which the court had held to be the law, and not to waive the other assignments of error. The Appellate Court considered and decided all the questions involved and all the assignments of error have been presented and argued here. We do not regard the ninth assignment of error as fixing any limitation on the amount of the judgment.

For the errors which we have pointed out in excluding from the claim for contribution the six notes executed within a few days after the death of Cunningham, amounting to $27,500, and the note for $2500 discounted by the Citizens' Bank of Peotone, and fixing as a basis of contribution one-sixth instead of one-third, the judgments of the Appellate Court and circuit court are reversed and the cause is remanded to the circuit court.

*Reversed and remanded.*