Theron Adair et al., Appellees, v. First National Bank of Belvidere, Illinois, Appellant.

Gen. No. 7,956.

Opinion filed May 14, 1929.   Rehearing denied June 18, 1929.

C. B. Chapman and Frank R. Covey, for appellant.

Woodward, Hibbs & Pool, John Dubbs and Butters & Butters, for appellees.

Mr. Justice Boggs delivered the opinion of the court.

On July 20, 1918, a bill was filed by appellees in the circuit court of LaSalle county, setting forth that on August 15, 1917, appellant obtained a judgment by confession against appellees, one A. F. Kember, A. O. Kellogg and W. C. Vittum, for $13,967.65; that the promissory notes on which said judgments were taken, other than as to W. C. Vittum, were without any good or valuable consideration; that in the years 1913 and 1914 there was under contemplation the building of an electric railroad from Ottawa to Mendota; that a large number of farmers had contributed large sums of money in furthering said project; that W. C. Vittum, one of the signers of said promissory notes, had assumed the authority to manage the affairs of said corporation and the raising of funds for the construction of the road, being assisted by Fred Abraham, a lawyer of Chicago, who had been an officer and director in the corporation until 1914; that Vittum was also assisted by appellees Hackman and Butterfield; that on January 7, 1914, Vittum and the defendants in said judgment met, at the instance of Vittum, in the home of Charles Battles; that at said meeting Vittum "stated that if promissory notes aggregating $25,500 could be procured to be executed by substantial farmers interested in the completion of the road, that such notes, or any money obtained on them, in the event that they would be negotiated, would be held secure until the ultimate completion of the road; that if the road should not be assured to be completed within a fixed time, the notes or the money obtained therefrom would be refunded"; that Vittum stated he had learned of a reliable contracting firm who would enter into a building contract to complete the road and guarantee the performance of the contract by a good bond in the sum of $50,000, and would take the bonds issued by the railroad company in payment for the labor and materials

for its construction, provided he should deposit notes for the sum of $25,500, or cash, to be held as security as an evidence of good faith, until the road should be completed. That, if it should be necessary to use money instead of the notes, he would obtain some person who would furnish the amount of money represented by the notes, and that the same would be deposited and held secure as a guaranty to the contractor who might be procured to construct the road, or to the person who might underwrite said bonds. That the complainants and the other of said persons, having implicit confidence in Vittum, signed five blank forms of promissory notes, dated January 7, 1914, four being for $5,000 each and one for $5,500, each of said notes falling due October 1, 1914 with interest at 6 per cent; that after the papers were signed, Vittum took possession thereof, and it was charged, on information and belief, that Vittum, Abraham, one Patten and one Marshall, knowing all the facts above stated, on April 15, 1914, "wrongfully and fraudulently agreed among themselves that Marshall would write in the name of appellant bank as payee; that Marshall would deposit the notes in the bank, and would draw on them a certain amount of money for Abraham and Vittum; that when the notes were collected of the makers, the bank and Patten would be entitled to the full amount, after paying into the bank the amount advanced Patten and Abraham."

Said bill further charged that Marshall caused the name of appellant bank to be inserted as payee in said notes, and that he, as president of said bank, "knew all of the facts connected with the papers, and how and for what purpose they were signed and to be used; that thereafter, on October 1, 1914, the makers of said notes were importuned by Vittum to renew the same, and that Vittum then fraudulently represented to them and the other defendants, that said bank had purchased

said notes for the full amount, principal and interest, and that he had deposited the money received from the bank with a certain surety company of New York as evidence of good faith for its underwriting the bonds of said company, which were to be taken by the contractor, who had then entered into a binding agreement to fully equip the road within a certain fixed time, and which contractor had already furnished a good and sufficient bond in the sum of $50,000 to the railroad company to insure the faithful performance of the contract.'' That Vittum pretended to represent and take care of the interests of the complainants and the other signers of said paper, but was in fact conniving with the bank and its officers and representatives, in attempting to fix a liability upon the complainants and those who signed the papers, so that they could be compelled to pay the notes to the bank, notwithstanding the bank was not an innocent holder for value.

Said bill further charged that the ''representatives of the bank at all times had full knowledge of all the facts above alleged; that it divided with Vittum, Abraham and Patten, who was also acting for the bank, the proceeds of said notes, and entered into the transaction for the sole object and purpose of obtaining an undue advantage of the responsible and solvent signers of the notes; . . . that Vittum was then and there and is now insolvent; that on October 1, 1914, by reason and because of the false and fraudulent representations of Vittum, which were fully known to the bank by its authorized representative, the complainants and the solvent defendants to the judgment were induced to sign new notes directly to said bank, three of said notes being entered in judgment in said action at law.'' That none of the money realized on said notes has ever been used, directly or indirectly, for the completion of said road, and that no work has been

done thereon; that no part of the representations made by Vittum have been carried out; that said judgment was opened up on motion of the complainants and other of the makers thereof, and they were given leave to plead; that thereupon appellant bank moved the court to vacate the judgment and dismiss the suit, which said motion is pending.

The bill further charges that it is the intention of said bank to dismiss said suit, if said motion is granted, and to take judgment by confession in some remote quarter of the state "and thereby, and by other vacations of future judgments and dismissal of future suits, so harass and embarrass them and others that, in sheer desperation, they will be forced to pay"; that said notes are, in legal contemplation, the property of the complainants and the others signing them, for the reason that if said railroad was not completed within a certain time, they were to be returned to the signers, "and were to be returned to the signers in any event after the completion of the road."

Appellant bank, W. C. Vittum and J. L. Witzeman were made parties defendant. Said bill prayed that said notes be declared null and void, and that appellant and the other of said defendants be required to surrender them up to be canceled; that appellant and the other of said defendants be enjoined from disposing, assigning or otherwise disposing of any of said notes, or of entering or attempting to enter judgment in any other court than the one in which they were then pending.

A temporary injunction was granted as prayed. Appellant bank answered, admitting the taking of judgment on said notes, but denying any and all charges of fraud or misrepresentation on the part of appellant bank and its officers, and denying any knowledge or information touching fraud or misrepresentation on the part of Vittum or any other person in connection with

the execution, negotiation and sale of said notes. Said answer alleges that the purchase by said bank of said notes was a bona fide transaction, before maturity, for a valuable consideration and denies that the complainants are entitled to the relief prayed, etc.

The bill was amended, by leave of court, charging that Vittum stated that the notes must aggregate $25,500, that ten persons would sign them, and that in case ten persons did not sign them, the whole scheme would become inoperative, and that he represented that William Conger and Pat Woods would sign. Certain other amendments were made to said bill with reference to the execution of the instrument purporting to authorize the officers of appellant bank to fill in the name of said bank as payee in said notes, etc.

The cause was referred to the master to take the evidence and to report the same to the court. Said evidence was so taken and reported.

The court found the facts to be substantially as alleged in appellees' bill as amended and "ordered, adjudged and decreed that the notes and the judgment entered thereon in this Court be and are held null and void, and that the collection of the notes and judgment from the complainants or any of them should be and the same is hereby enjoined, and the complainants and each of them are freed from any liability thereon."

To reverse said decree, this appeal is prosecuted. The questions arising on this record, under the assignment of errors, may be summarized as follows:

First. Whether the name of the payee in the original notes was inserted by the officers of appellant bank without lawful authority.

Second. Whether said original notes were not to become operative unless signed by ten persons.

Third. Whether the failure of Louis Willey to sign said renewal notes here involved would work a discharge of those signing the same.

Fourth. Whether in the purchase of said original notes and in the taking of said renewals, appellant bank and its officers were guilty of fraud and misrepresentation.

First. The evidence discloses that when said original notes were signed, the name of the payee was left blank for the sole reason that the makers thereof did not know where they would be able to negotiate the same. Under the Negotiable Instruments Act, the bank, having purchased said notes for valuable consideration, had authority to fill in its name as payee. Cahill's St. ch. 98,¶ 34; *Young v. Ward,* 21 Ill. 223–225; *Weston v. Myers,* 33 Ill. 424–432; *Merritt v. Boyden,* 191 Ill. 136–146; *Kramer v. Schnitzer,* 268 Ill. 603–606; *Leseure v. Weaver,* 99 Ill. App. 375–380. The mere fact that appellant bank, out of abundant precaution, may have taken a written instrument in reference thereto, did not take away the authority which the law gave the bank to fill in said blank.

Second. An examination of the testimony offered on behalf of appellees discloses that there was no definite agreement among the makers of said original notes that ten persons should sign the same before they were negotiated. Appellee Butterfield testified: "I think it was decided that eight or nine would go on to raise the amount of money on those notes."

Appellee Hackman testified that Vittum stated, after the notes were signed, that "he thought he could get a couple more signers. . . . Something was said about ten signers, but I can't remember what it was, but after eight had signed he said he thought he could get two more. Among us, we thought there would be eight or ten who would sign."

Appellee Luce testified: "We had agreed among ourselves how many would sign, but McLaughlin and Battles were asked to sign, but they would not. Vittum said Conger had said he would sign them. Kel-

logg had said he would sign them, and afterwards did so, but Conger did not."

Appellees' contention in this behalf is not well taken.

It might be further observed, in reference to both the first and second propositions, that the notes which were executed in blank, and which appellees contend were to be signed by ten people, are not the notes here involved. The notes here involved are renewal notes in which the name of the bank was written in in the first instance, and which were not signed by as many as had signed the original notes.

Third. Louis Willey, one of the signers to the original notes, was in Canada at the time the renewal notes were executed. It is contended by appellees that when appellant accepted said renewal notes without the signature of Willey, it amounted to a release as to him, and that the signers of said renewal notes were thereby discharged.

The evidence fails to disclose that appellant bank had any connection with the signing of said renewal notes. The evidence does show that when it accepted said renewal notes without the name of Willey, the accrued interest and $2,000 on the principal was paid. In this connection, appellee Adair testified: "The 2nd day of October . . . Mr. Vittum and Mr. McDougall were there. Mr. McDougall told us it was a perfectly legitimate transaction, and that we must take care of the notes. . . . New notes were prepared that day, payable to the First National Bank of Belvidere. I don't think I looked at them, and I signed them, five or six." On cross-examination he testified: "I think Mr. McDougall was representing the First National Bank of Belvidere, and at that time all of us talked over the matter of adjusting the notes we had previously given, and then the new notes were given."

Appellee Luce testified in this connection: "On that day the interest was paid and $2,000.00 on the principal, and then the renewal notes were given."

Appellee Hackman testified that the original notes were turned over to him, and that he had them. Willey testified on behalf of appellees that appellee Hackman and Vittum asked him to sign said renewal notes, and that he refused to do so.

The signers of said renewal notes, of their own motion, made payment of $2,000 on the principal of said indebtedness, together with the interest thereon, and delivered to appellant bank said renewal notes, without the name of Willey, and took up the original notes.

The giving of a renewal note is prima facie payment of the original debt. *Trego v. Cunningham's Estate,* 267 Ill. 367–375, citing *Smalley v. Edey,* 19 Ill. 207; *Leake v. Brown,* 43 Ill. 372. Whether the giving of a promissory note in renewal of another operates as a satisfaction of the original note is a question of fact, and depends on the intention of the parties. *Boulter v. Joliet Nat. Bank,* 295 Ill. 594–596; *Belleville Sav. Bank v. Bornman,* 124 Ill. 200, 206, 207; *Jansen v. Grimshaw,* 125 Ill. 468–476. The facts and circumstances surrounding said transaction disclose that said payment was made and said renewal notes were delivered in settlement and discharge of the original notes.

Fourth. Where the prayer for relief is based on a charge of fraud and misrepresentation, the proof in support thereof must be clear and convincing. *Mosbarger v. Brown,* 313 Ill. 238–248; *Carter v. Carter,* 283 Ill. 324–332; *McKennan v. Mickelberry,* 242 Ill. 117–134; *Schroeder v. Walsh,* 120 Ill. 403–409.

In this connection, appellee Luce testified: "About the 15th or 16th of April, Butterfield came to me and said Hackman had been up to Belvidere, and he thought the bank there would finance the notes, and

said Hackman had requested him to come up and 'for God's sake bring Miss Luce.' . . . We went to Belvidere to see if we could induce the bank to take them (the notes). We went there to see if they would not cash them. I and the parties who went there asked Marshall if he would not cash them. . . . Before Marshall would take the notes, he asked me if I understood the nature of the joint note."

Appellee Hackman testified: "At the meeting in the directors' room, Butterfield said the notes were issued to pay an advance for building the road, to interest the contractor, and we had to have $25,500 to get them interested. . . . After they considered the matter (the officials of the bank) Marshall finally said, 'We will furnish the money,' and he wanted to know who it would be paid to and it was said 'To Mr. Vittum.' "

Appellee Butterfield testified: "It was finally decided that we would make arrangements to cash the notes. Marshall wanted to know if we knew what we were getting into." On cross-examination he testified: "Miss Luce and I went up and met Hackman there, and the three of us asked the bank to take the notes. We had a conference with Mr. Marshall, the president, and Mr. Covey, the attorney for the bank, as to the notes and the financial responsibility of the makers, and as to whether or not the bank would take the notes. Mr. Marshall asked us if we fully understood what we were doing, and we talked about the issuing of the bonds for the purpose of completing the construction of the road, and Marshall told us that if the bank took the notes, that it would not rely upon the bonds which were issued paying the notes, but that the notes had to be paid anyway, even if paid by the makers of the notes."

The foregoing, in substance, is the testimony of appellees with reference to the attitude of appellant bank in connection with the purchase of said notes. Instead

of showing fraud and misrepresentation on the part of appellant bank and its officers, it discloses that said transaction was bona fide, and upon a valuable consideration.

It is strenuously contended on the part of counsel for appellees that, because appellant paid only $18,500 in cash and delivered to Patten bonds aggregating $7,000, this, in and of itself, constituted a fraud on the makers of said notes.

There was no agreement between appellant bank and the makers of said notes that, in the purchase of the same, it was to pay the face value thereof in cash. So far as said bonds were concerned, appellant bank paid $6,700 for the same. Before purchasing the same, Marshall, the president of said bank, made investigation and found that the issue, aggregating $60,000, was secured by property appraised at $165,000. While the evidence discloses that the holders of said bonds finally had to take less than their face value, there is nothing to show that, at the time the same were delivered to Patten, they were not worth their face. But, even if it did so show, it would not render said transaction fraudulent.

Without reference, however, to what transpired at the time said original notes were sold to appellant bank, the notes here involved were given by appellees and the other makers thereof, voluntarily, with $2,000 in cash, in settlement for the original notes. Under the above authorities, this amounted to a payment thereof.

Under any view of the evidence, the court erred in finding that said notes were null and void in the hands of appellant, either for want of consideration or on account of fraud and misrepresentation.

For the reasons above set forth, the judgment and decree of the trial court will be reversed and the cause will be remanded with directions to dismiss said bill for want of equity.

*Reversed and remanded with directions.*