B. K. Goodman, Appellee, v. Katherine Howell McLennan, Individually and as Executrix of Last Will and Testament of Hugh McLennan, Deceased, et al., Appellants.

**Gen. No. 43,922.**

Opinion filed May 4, 1948.   Released for publication June 8, 1948.

CHAPMAN & CUTLER, of Chicago, for certain appellant and ECKERT & PETERSON, of Chicago, for certain other appellant; PERRY M. CHADWICK, WALTER W. ROSS, JR. and JOHN R. ROGERS, all of Chicago, of counsel.

MAURICE L. DAVIS, of Chicago, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Defendants appeal from a decretal judgment order of the Superior court of Cook county entered July 3, 1946. Some time prior to the appeal in the instant case we had before us an appeal from a judgment of the Circuit court of Cook county in the case of *In re Estate of Hugh McLennan, Dec'd—Goodman v. McLennan, Executrix under the Last Will and Testament of Hugh McLennan, Dec'd,* 322 Ill. App. 690 (*Abst. Opinion.* App. Den. by Supr. Ct., 386 Ill. 630). For

a proper understanding of the two questions we are deciding in the instant appeal we deem it advisable to incorporate in this opinion practically the entire opinion we delivered upon the appeal from the judgment of the Circuit court. It reads as follows:

"B. K. Goodman filed a petition in the Probate court of Cook county against Katherine Howell McLennan, Executrix under the Last Will and Testament of Hugh McLennan, Deceased, by which he sought to recover certain certificates from the executrix which the latter had in her possession and which she claimed to be a part of the estate of McLennan. The executrix, as respondent, filed an answer to the petition and there was a hearing before the judge of the Probate court. Petitioner offered evidence in support of the petition, but respondent offered no evidence, contending that the case made out by petitioner was insufficient to justify a finding in his favor. A decretal judgment was entered in favor of petitioner which directed the executrix to turn over and deliver to him the certificates in question. An appeal was taken by respondent to the Circuit court, where there was a trial *de novo* before the court and a jury and a verdict was returned against petitioner and in favor of the executrix. The trial court denied petitioner's motion for a new trial and entered an order dismissing petitioner's petition as amended. Petitioner appeals.

"The verified petition filed in the Probate court is as follows:

" 'Your petitioner, B. K. Goodman, . . . respectfully represents unto this Honorable Court as follows:

" '1. As of August 11, 1933, he executed an assignment to The Foreman-State National Bank of all of his right, title and interest as beneficiary or otherwise, under or arising out of that certain trust agreement, dated January 24, 1933, executed by and between Continental-Illinois National Bank and Trust Com-

pany of Chicago, as Trustee, and Merchants and Manufacturers Securities Company, a corporation, Hugh McLennan (the decedent), Albert J. Weisberg, B. K. Goodman (your petitioner) and Continental-Illinois National Bank and Trust Company of Chicago in its individual capacity, as beneficiaries. Thereafter, The Foreman-State National Bank of Chicago conveyed all of its said right, title and interest to The First National Bank of Chicago, which held the same until March 25, 1939. As of March 25, 1939, The First National Bank of Chicago conveyed all of its said right, title and interest to Hugh McLennan.

" '2. Pursuant to the said trust agreement of January 24, 1933, the said beneficiaries had caused to be deposited with and held by the Continental-Illinois National Bank and Trust Company of Chicago, as Trustee, subject to the terms of the said agreement, all Class B Preference Certificates of Beneficial Interest in the Chicago Produce District Trust issued pursuant to the provisions of that certain trust agreement, dated July 14, 1932, identified as Trust No. 29471, made by and between Hugh McLennan, B. K. Goodman and Albert J. Weisberg, as Grantors, Chicago Title and Trust Company, as corporate Trustee, S. J. T. Straus, Sidney H. Kahn and Henry R. Platt, Jr., as Produce Trustees, and S. W. Straus & Co., as Depositary, together with certificates representing 22½% of all common shares of beneficial interest in said Chicago Produce District Trust issued pursuant to the provisions of said trust agreement.

" '3. In March, 1938, McLennan agreed, for good and valuable consideration, to purchase the said interest in said trust agreement of August 11, 1933, from The First National Bank of Chicago as agent for your petitioner and thereupon to turn it and the certificates and stock involved over to your petitioner, who would then repay to him the purchase price. The said agreement was verbal and was entered into in Chicago,

and was never rescinded or modified in any way. The consideration for the said agreement was the performance of services by your petitioner in behalf of McLennan, which services were actually performed by your petitioner in accordance with the agreement and to the expressed satisfaction of McLennan.

" '4. As of March 25, 1939, The First National Bank of Chicago assigned to McLennan all of the right, title and interest which it acquired under the assignment bearing date of August 11, 1933, executed by B. K. Goodman, under or arising out of that said trust agreement dated January 24, 1933. McLennan purchased the said right, title and interest as agent for your petitioner, pursuant to the verbal agreement he had with your petitioner. The said interest is, therefore, not part of the estate of McLennan, but belongs instead to your petitioner.

" '5. Your petitioner claims ownership of the said interest under or arising out of the trust agreement of January 24, 1933, and of the Class B Preference Certificates and common shares of the Chicago Produce District Trust, which are the subject thereof. He herewith tenders to the executrix of the estate of Hugh McLennan the amount paid by McLennan in his behalf for the interest in the said trust agreement, certificates in common shares and tenders further interest at the lawful rate and costs, if any, all as may be determined by this court.

" 'Wherefore, your petitioner prays for the entry of an order or orders authorizing and directing the executrix to turn possession of the said interest, certificates and shares over to him, and authorizing and directing her, further, to execute and deliver to him any assignment or assignments or other instruments that may be necessary in connection with the transfer thereof to him, and for such other and further relief in the premises as shall be equitable and just.'

"Later the following verified amendment to the petition was filed:

" '(1) This Amendment to his Petition is filed pursuant to the order entered by this Honorable Court on November 8, 1940. Your petitioner incorporates herein by reference, with the same force and effect as if herein set forth in full, all of the allegations of his original petition and adds thereto this more specific statement of the time and nature of the consideration for the agreement made between your petitioner and the late Hugh McLennan.

" '(2) For some time prior to May, 1938, Hugh McLennan was defending a suit brought against him and others by Benjamin Weintroub and others and he feared early in 1938 that he would thereby be subjected to a substantial judgment. He, therefore, asked your petitioner's assistance at that time in bringing about a settlement of the suit. He agreed in consideration thereof to purchase the said interest in said Trust Agreement of August 11, 1933, from The First National Bank of Chicago, as agent for your petitioner, and thereupon to turn everything over to your petitioner, who would then repay to him the purchase price.

" '(3) Your petitioner conferred with various parties in interest on several occasions prior to the end of the month of May, 1938, and succeeded in bringing about an adjustment of the principal matters in controversy in said suit and reduced the liability of McLennan to a comparatively small amount. McLennan was informed at all times of the services and approved of them. He acknowledged that they were of great benefit to him and in accordance with the said verbal agreement. He admitted that he was, therefore, under the contractual obligation to purchase the said interest for your petitioner.

" '(4) In further consideration of the said agreement and in reliance thereon, your petitioner made no effort to purchase the said interest directly from The First National Bank of Chicago. Had there been no such agreement, your petitioner would have dealt di-

rectly with the bank and purchased the interest from it. From time to time McLennan assured him that he was negotiating with the bank for the purchase of the said interest for your petitioner. By these representations, your petitioner was induced to take no action in his own behalf.'

"The verified answer of respondent is as follows:

" '1. That she neither admits nor denies the allegations contained in Paragraphs 1 and 2 of said Petition, but states that she has no knowledge of the matters therein set forth sufficient to form a belief as to the truth or falsity thereof and therefore demands strict proof thereof;

" '2. That she denies each and all of the allegations contained in Paragraph 3 of said Petition, and especially she denies that Hugh McLennan, the decedent herein, in March, 1938, or at any other time, agreed with B. K. Goodman to purchase any certificates of shares, stock, or other property from the First National Bank of Chicago, as agent for the petitioner, B. K. Goodman, and further denies that any services were performed by the said B. K. Goodman, petitioner, for or on behalf of said decedent as consideration for any Agreement, expressed or implied, between the deceased and B. K. Goodman for the purchase of any certificates of shares, stock, or any other property by said deceased from the First National Bank of Chicago for or on behalf of said petitioner.

" '3. That she admits that the deceased purchased from the First National Bank of Chicago, all the right, title and interest which said Bank acquired under a certain assignment bearing date of August 11, 1933, executed by B. K. Goodman, assigning to the Foreman-State National Bank of Chicago, all right, title and interest as beneficiary, or otherwise, of the said B. K. Goodman, under a certain trust agreement dated January 24, 1933, executed by and between Continental Illinois National Bank and Trust Company of Chi-

cago, as Trustee and Merchants and Manufacturers Securities Company, a corporation, Hugh McLennan, Albert J. Weisberg and B. K. Goodman and Continental Illinois National Bank and Trust Company, and states that the right, title and interest under said agreement acquired by said assignment from the First National Bank of Chicago by the said Hugh McLennan, Deceased, was acquired by the said Hugh McLennan, as and for his own use and property; that the said right, title and interest acquired by the said Hugh McLennan from the First National Bank of Chicago is a part of this estate and belongs to this estate and is not the property of B. K. Goodman, the petitioner.

" '4. That she denies the allegations contained in Paragraph 5 of said Petition.

" '5. That she denies each and all of the allegations contained in Paragraphs 2 to 4, inclusive, of the Amendment to the Petition of B. K. Goodman filed herein on November 12, 1940.

" 'Further answering the Petition of the said B. K. Goodman, heretofore filed herein, this Executrix asks that said Petition be dismissed by this court and that the relief prayed for therein, be denied to said petitioner.'

"Petitioner contends that the verdict is against the manifest weight of the evidence. Respondent contends that the claim of petitioner is based upon 'fabricated testimony' and is not an honest claim; that petitioner attempted to prove the alleged agreement by oral statements claimed to have been made by McLennan, now deceased, and that when the evidence bearing upon the alleged statements is carefully scrutinized and considered with all of the other evidence in the case in the light of the law that applies to such evidence, it clearly appears why the jury and the trial court refused to believe the evidence of petitioner as to the alleged agreement. As we have reached the conclusion, after a careful examination of all the evidence,

that the contention of respondent is a meritorious one, we deem it proper to state at some length the evidence that bears upon the alleged agreement.

"Petitioner sought to prove the alleged agreement by the testimony of Grace Burke, Edward L. Schoen and Sam Lederer. Grace Burke was the secretary of petitioner and had been so employed by him for nine years. She testified that she first saw McLennan in Goodman's office 'in the early spring' of 1938; that McLennan came into the office and spoke to Goodman; that McLennan 'said he was afraid there was going to be a substantial judgment entered against him in the Weintraub case and he wanted Goodman to use his influence in getting that case settled'; that Goodman said he thought McLennan had a lot of nerve coming to him and asking him to do a thing like that, because a few years prior he had asked McLennan to do him a favor and McLennan refused; that McLennan said he was sorry he had not done what Goodman asked, but he was willing to do it now, that he would buy Goodman's interest in the South Water Market from the First National Bank for him if Goodman would help to get the case settled; that McLennan asked Goodman what he would pay for it, and Goodman said he would pay $3,000, that if necessary he would go as high as $5,000, but that he wanted to get it as cheaply as he could. 'That is all I can remember of the conversation.' Upon cross-examination she testified that Goodman's office is right off the reception room, and that at the time she was at her desk in the reception room, right outside the doorway of Goodman's office; that no one else was present in the office; that she did not speak to McLennan upon his arrival, that he walked right past her; that McLennan did not have an appointment with Goodman; that she could see McLennan in Goodman's office by looking through the door; that he was standing; that he was in Goodman's office about half an hour, maybe longer; that she does not

know the month the talk took place but 'it was in the early spring' of 1938; that she does not remember what she was doing while McLennan was in Goodman's office; that she does not recall any other conference that Goodman had in his office at that time of the year; that Goodman first spoke to her about the talk in August or September, 1940; that she has discussed with Goodman that talk eight or ten times, maybe a dozen times. Miss Burke's testimony is the strongest evidence in support of the alleged agreement. If we were to assume the truth of her testimony as to what occurred at the time and place in question, nevertheless, it fails to show any acceptance by Goodman of the alleged offer made by McLennan or any promise by Goodman that he would try to settle the Weintraub case. Edward L. Schoen testified that he was a printing and advertising salesman; that he knew Goodman and knew McLennan 'casually'; that he did not have anything to do with the South Water Street Market; that he met McLennan and Goodman on the east side of Michigan avenue, around Randolph street, about the end of the summer or the beginning of the fall of 1938; that he met them 'possibly north of Randolph street . . .'; that Sam Lederer was with the witness; that he heard a conversation between McLennan and Goodman at that time; 'Q. Well, state what it was. A. Well, Sam and I were walking along and Goodman and McLennan were walking in the opposite direction, south I would say, and Sam greeted Mr. McLennan and Mr. Goodman . . . There was not any particular conversation between Mr. McLennan and Mr. Goodman. . . . Mr. McInerney [attorney for petitioner]: Q. What did Mr. McLennan say? The Witness: A. Mr. McLennan said, ''Ben and I are working together again. As a matter of fact, I am buying his stock, his interest'', or something like that—''in the South Water Market back for him from the First National Bank and we are going to be partners again.''

Q. Did Goodman say anything? A. I don't remember what Goodman said.' Upon cross-examination Schoen testified that he could not give the day or month that the conversation took place; that he could not remember what he and Lederer had been talking about before they met McLennan and Goodman; that he talked to Goodman about the conversation about the end of 1939 or the beginning of 1940 in Goodman's office; that he had no business with Mr. Goodman at the time. Sam Lederer testified (by deposition) that he lived at the Majestic Hotel, 29 W. Quincy street, Chicago; that he is a publicity man; that fifteen years before that time he had handled the publicity of the Chicago Produce District Trust or the South Water Street Market; that McLennan and Goodman were connected with it; that he knew them and was employed by them; that he worked for the Market and they were its executives; that there was a three months' campaign to publicize the Market at that time; that he last saw McLennan about a year prior to his death; that it was either late in the summer or early in the fall that he saw him on the east side of Michigan avenue, about a block south of 307 North Michigan; that Goodman was with McLennan; that he (Lederer) was with Schoen at the time; that the meeting was 'by accident'; that McLennan said: ' "Well," he says, "we are going to be good friends again now. In fact," he says, "I am going to buy some of Ben's stock from the Bank for him;" ' ' that he could not recall anything more of the conversation and if Goodman said anything he could not recall it. Upon cross-examination the witness stated that it was early in the afternoon that he met McLennan and Goodman; that he could not recall where he had been prior to the time he met Schoen; that he could not recall anything that he and Schoen had talked about prior to the meeting with Goodman and McLennan; that after that day he met Goodman frequently in a social way; that in

the fall of 1939 he learned of McLennan's death through the newspapers and within a few days thereafter he went to Goodman's office and said: ' "Well, I see Hugh McLennan is dead." I said, "He should have outlived me by twenty-five years. He was a strong, powerful man." And we discussed his habits and so forth'; that at that conversation he told 'Mr. Goodman about the conversation on Michigan avenue,' but that Goodman did not say anything about it; that he said to Goodman: 'The last time I saw him was about a year ago when you were together on Michigan avenue,' but that Mr. Goodman said nothing in answer to that statement; that between the time of the conversation on Michigan avenue and the time of McLennan's death he saw Goodman frequently,—sometimes at Goodman's home.

"There is nothing in the testimony of Miss Burke, Schoen or Lederer that tends to prove that Goodman accepted the alleged offer of McLennan and agreed to perform the service. Their evidence as to the alleged agreement is uncertain and indefinite as to its terms. The amended petition alleges that petitioner, at the request of McLennan and as an acceptance of his promise to purchase, 'succeeded in bringing about an adjustment of the principal matters in controversy in said suit and reduced the liability of McLennan to a comparatively small amount.' To prove this allegation petitioner relies upon the testimony of Attorney Samuel P. Gurman. The following is the gist of Gurman's testimony: 'I had a conversation with Goodman referable to the settlement of the accounting suit, in so far as McLennan *and the other defendants* were involved. . . . That accounting suit was dismissed by settlement in May, 1938. The liability of McLennan was extinguished by that settlement and dismissed. I had a conversation with McLennan referable to the settlement around January or February, 1938, in your (Mr. McInerney's) office. . . . McLennan called

me aside. The matter of settling the suit was considered and he said to me at the time: "You know my differences with B. K. Goodman have been straightened out and I am sure Goodman is going to talk to you about that, and I wish you would go easy and settle· this case up for me." I told him Goodman had talked to me about settling the case up, he had a number of conversations with me.' Gurman's evidence does not show that Goodman 'succeeded in bringing about an adjustment of the principal matters in controversy in said suit and reduced the liability of McLennan to a comparatively small amount.' It does show that Goodman's conversation with Gurman related to McLennan 'and the other defendants.' What defendants, if any, paid anything in settlement of the suit does not appear. Grace Burke testified that the McLennan conversation in petitioner's office took place in the early spring of 1938. Her testimony is susceptible of but one interpretation, *viz.*, that McLennan then made, for the first time, his offer to Goodman. But Gurman states that in his talk with McLennan around January or February, 1938, in the office of Goodman's lawyer, McLennan told him that his differences with Goodman had been straightened out and that he was sure Goodman was going to talk to Gurman about it. There is no evidence to support the following allegations in the petition: 'Petitioner conferred with various parties in interest on several occasions . . . .' 'McLennan was informed at all times of the services and approved of them.' 'He acknowledged that they were of great benefit to him and in accordance with the said verbal agreement. He admitted that he was, therefore, under the contractual obligation to purchase the said interest for your petitioner.'

"Petitioner's case is based upon the testimony of the foregoing witnesses, and the material parts of their testimony relate to alleged statements and admissions by McLennan. Before taking up facts and cir-

cumstances in evidence that respondent contends show clearly that the evidence of Miss Burke, Schoen and Lederer is 'fabricated,' we will refer to the law that bears upon the testimony of said witnesses for petitioner. Many years ago the Supreme court of the United States (*Lea v. Polk County Copper Co.,* 62 U. S. 493, 504) stated that '. . . courts of justice lend a very unwilling ear to statements of what dead men had said.' In *Keshner v. Keshner,* 376 Ill. 354, 363, our Supreme court made a like statement and added 'that such evidence is subject to great abuse and that it will be carefully scrutinized as well as considered with all the other evidence in the case. (*Megginson v. Megginson,* 367 Ill. 168, 180; *Fierke v. Elgin City Banking Co.,* 366 id. 66.)' In *Megginson v. Megginson,* 367 Ill. 168, 180, the court states: 'We have recently had occasion to observe that the evidence of admissions made by persons since dead should be carefully scrutinized and considered with all the evidence in the case, as it is likely to be abused. *Fierke v. Elgin City Banking Co.,* 366 Ill. 66; *Moreen v. Estate of Carlson,* 365 id. 482.' Many decisions of the sister States, to the same effect, might be cited if it were necessary, but the rule of law announced in the foregoing cases is well settled. If that rule did not prevail no estate would be safe from dishonest claims.

"Evidence for respondent shows that the securities in question, together with other securities, came into the possession of the First National Bank by assignment from the Foreman-State National Bank on or about September 8, 1936, and that the First National Bank held the securities in question as its own property until it assigned them to McLennan on or about April 21, 1939. The securities in question were a part of collateral securities given by Goodman to secure the payment of his note. Goodman apparently defaulted on his note and the bank took the securities and cancelled Goodman's obligation. During all the

time that the bank retained possession of the securities in question it was endeavoring to dispose of them, and Johnson, one of its vice presidents, testified that the bank 'would sell the interest to whoever would pay us the most for it.' While the said securities were held by the Foreman-State National Bank ·an effort was made to sell them to McLennan in 1933. An effort was made by the First National Bank to sell them to the Continental Bank but without success. Then it tried to sell them to McLennan for $5,000, but McLennan asked the bank 'to hold off until he returned from his honeymoon.' In August, 1936, McLennan stated to the bank that he was not interested in purchasing the securities because of pending litigation involving the subject matter of the sale. The record does not clearly show the nature of that litigation nor why it prevented McLennan from purchasing the securities. The bank again had negotiations with McLennan in July, 1937 (the accounting suit was then still pending), and he then indicated that he would be interested in acquiring the securities for $4,500, but he stated that it would take at least ninety days before he could take the matter up as he was leaving for Europe. It must be kept in mind that the alleged offer to Goodman did not take place until the early spring of 1938. Albert J. Weisberg, who was acting for the First National Bank in liquidating certain collateral, including the securities in question, testified: 'Johnson [assistant vice president of the bank] and I offered to sell it to the Continental Bank, who had held some of this same stock, and they were not interested at that time. Then we offered it to McLennan, who was interested at that time, but did not have the funds, and we—both Johnson and I—negotiated with him from time to time until he actually acquired the interest. We had our first negotiations with McLennan in 1933 [they were then connected with Foreman-State National Bank], sometime after we had acquired the collateral from Good-

man. In substance we told him that we had acquired this Goodman interest and that we were liquidating all of the various assets we had, and would he be interested, and we offered it at a price of, I believe, $5,000. He did not accept it at that price in the first instance. Some time later he made various inquiries of Johnson and others at the bank, but did not have the funds at that time. I had talked to McLennan at various times, because I saw him in connection with the South Water Market. He would always ask whether that [the securities in question] was still available. I stated it was still there. He wanted to know whether the price had changed any, because there were some redemptions. I told him he would have to talk to Johnson about the price. I knew what the price was in the first instance and there were various negotiations with him until he finally made the deal with Johnson sometime in 1938.' The evidence is conclusive that while McLennan was negotiating for the securities in question over a period of years, commencing in 1933, during all of that time any person who was willing to pay the price requested by the banks might have purchased the securities. Johnson further testified that in March of 1938 the First National Bank again had negotiations with McLennan in reference to the securities and that the latter then stated 'that he would not pay more than $4,000 for it, and if we cared to accept that amount he would arrange to buy it.' On June 15, 1938, McLennan purchased the securities in question for $4,000, paying $1,000 in cash and giving a note for the balance, payable in six months. The note was not paid in full when it became due but it was partially paid and renewed and was finally paid in full on March 25, 1939. Had McLennan been buying the securities for Goodman it would have been unnecessary for him to give his note for the unpaid balance and afterwards renew it because, according to petitioner's theory, he stood ready to repay McLennan the

entire purchase price paid for the securities. There is no doubt that McLennan purchased the securities in question on June 15, 1938, yet, Lederer testified that when they met McLennan and Goodman on Michigan avenue *at the end of the summer or the beginning of the fall of 1938* McLennan said: 'We are going to be good friends again now. In fact, *I am going to buy* some of Ben's stock from the bank for him,' and Schoen testified that McLennan said, 'I am buying his stock . . . for him.' On September 30, 1938, McLennan wrote to Weisberg and offered to sell him a one-half interest in the securities in question for one-half of the price he paid for the securities, or, in the alternative, he offered to give Weisberg a one-quarter interest in the securities on account of services previously rendered by Weisberg 'in various real estate problems.' Weisberg elected to accept a one-quarter interest in the securities and the written assignment of a one-fourth interest to Weisberg, signed by McLennan, dated May 18, 1939, is a part of the record. As respondent argues: 'McLennan gave to Weisberg a one-quarter interest in the security without receiving a penny for it and petitioner sought to persuade the court and jury that when he did so he knew that the security did not belong to him but belonged to Goodman.'

"The amended petition alleges that petitioner made no effort to purchase the said securities directly from the First National Bank because he relied upon McLennan's agreement to purchase the securities for petitioner. It is pertinent, therefore, to examine into petitioner's actions, positive and negative, that bear upon that subject. Goodman was a businessman. There is no evidence that at any time during the period of years that the banks held the securities and were ready and willing to sell them, Goodman or anyone on his behalf made any effort to purchase these securities from the banks. In fact, Johnson testified:

'I never had any negotiations with B. K. Goodman' with respect to the purchase of it.' There is no evidence to show that after the alleged agreement Goodman made any effort to obtain the securities from McLennan or that he made any inquiries as to the status of the securities, although eighteen months elapsed between the time of the alleged agreement and McLennan's death. While petitioner could not testify to conversations he had with McLennan, if he had any, still, if there were any letter, note or memorandum that bore upon the subject and that passed between him and McLennan, such evidence would have been competent. The record is silent as to whether he ever conferred with anyone at the bank to ascertain if a sale had been consummated. So far as the record shows, for at least one year after the death of McLennan, which occurred eighteen months after the alleged contract was made, Goodman made no inquiries of the bank in respect to the securities. According to the testimony of Schoen and Lederer, McLennan stated that he and Goodman were working together; which, if true, would certainly have created a situation that would have given Goodman ample opportunity to inquire of McLennan about the securities during the latter's lifetime. Lederer testified that a few days after McLennan's death he went to Goodman's office and called his attention to the death of McLennan, and, strangely indeed, reminded Goodman of the alleged conversation on Michigan avenue. Schoen testified that he talked with Goodman about that conversation, in Goodman's office, 'maybe the last part of 1939 or the first part of 1940.' Goodman testified that he first learned in August or September, 1940, which was two and one-half years after the alleged agreement was made, *and a year after the death of McLennan,* that McLennan had purchased 'the certificates in controversy here,' and he further testified as to how he learned that fact. He states that in August or

September, 1940, he called Charles Aaron, attorney for the First National Bank, and 'I asked Aaron *what price the bank would take for my interest in the South Water Market* which I had given to the bank previously. He told me he would find out how much the bank wanted for it and would let me know. I did not hear from him for two, three or four days. The conversation was my asking him how much the bank would want and he telling me he would let me know as soon as he took it up with the bank. He called me two, three or four days later and told me he was surprised to hear that the bank had already sold my stocks that I had owned and had sold it to McLennan just before McLennan died.' Thus it appears from his own testimony that he called the bank, not to ascertain whether McLennan had purchased the securities, and, if so, when, and at what price, but to find out what price the bank would take for the securities. It would appear from petitioner's testimony that when he spoke to Mr. Aaron he did not have in mind the alleged agreement that he claims he had with McLennan in reference to the securities. The petition alleges that Goodman performed his part of the contract by May, 1938, when the law suit was settled. McLennan lived for fifteen months thereafter, yet there is not a fact or a circumstance in the case to show that Goodman ever inquired of McLennan during the said period of time whether the latter had discharged his obligations under the alleged agreement.

"The jury, who saw and heard the witnesses, found by their verdict that they did not believe petitioner's evidence as to the alleged agreement. The able and experienced judge who tried this case, when he denied petitioner's motion for a new trial, said: 'I think it is a very fair verdict.'

"Petitioner contends that the 'court erred in treating the petition . . . as a *common law claim or*

demand against said estate of Hugh McLennan; and erred in overruling the petitioner's objections to impaneling a jury and the submission of the issues to such jury in said case; and erred in entering a common law judgment on the verdict so returned by the jury. . . . ' [What we said in answer to this contention has no bearing upon the instant appeal and is therefore omitted.]

" . . .

"The decretal order entered recites:

" '1. The motion of the petitioner, B. K. Goodman, for a new trial in this cause be and the same is hereby overruled and a new trial denied;

" '2. The motion of the petitioner, B. K. Goodman, in arrest of judgment be and the same is hereby overruled;

" '3. That the petitioner, B. K. Goodman, take nothing by his suit and that the respondent, Katherine Howell McLennan, Executrix, go hence without day, and that the respondent, Katherine Howell McLennan, Executrix, do have and recover of and from the petitioner, B. K. Goodman, her costs as taxed by the Clerk of this Court, and have execution therefor;

" '4. That the petition of B. K. Goodman as originally filed in the Probate Court of Cook County, Illinois, and as amended and as filed herein, be and the same is hereby dismissed.'

"Therefore, if the petition be regarded as in the nature of a *quasi* equitable proceeding the counsel agreed to have the issue of the alleged agreement submitted to the jury, the accounting to be determined by the court, if the jury found for petitioner, and the trial court, in effect, adopted the finding of the jury and dismissed the petition.

" . . .

"Satisfied, as we are, that the verdict of the jury and the decretal judgment are just, and in accordance

with the evidence and the law, the decretal judgment of the Circuit court of Cook county is affirmed.

*"Decretal judgment affirmed."*

After we filed the foregoing opinion Goodman filed in the Supreme court of Illinois a petition for leave to appeal from our judgment, which petition was denied. Goodman then filed in the Supreme court a second petition praying for a review of his petition for leave to appeal, which petition was also denied.

Some time after the denial of the second petition by the Supreme court plaintiff commenced the present action in the Superior court of Cook county. The complaint, amended four times, alleges, in substance, that McLennan agreed orally in March, 1938, to purchase the Goodman interest from the First National Bank of Chicago for the use and benefit of plaintiff and as his agent, and that he further agreed that when he made such purchase he would transfer that interest to plaintiff upon reimbursement of the amount expended by McLennan; that plaintiff was to be the undisclosed principal of McLennan in the transaction; that the latter made the purchase pursuant to the said agreement; that since the purchase was made for the benefit of plaintiff the Goodman interest became the property of plaintiff from and after the date of its purchase; that in reliance upon said agreement plaintiff made no offer to purchase the Goodman interest from the First National Bank of Chicago; that shortly after McLennan acquired such interest from said Bank he transferred a one-fourth interest thereof to Albert J. Weisberg; that neither McLennan nor Weisberg ever disclosed the transfer until the trial of the first case in the Circuit court; that neither the Probate court nor the Circuit court had jurisdiction of the proceedings instituted by plaintiff in the Probate court because defendant Weisberg was a necessary party to the proceedings by reason of his ownership of a one-fourth share of the property involved; that defendant

Weisberg was not a party to the Probate court proceedings and that that court had no jurisdiction to try a disputed title to property of third persons; that the interests of the two defendants were indivisible and the Probate court had no jurisdiction to enter any order affecting the alleged ownership of Weisberg in the property involved; that the inventory filed by defendant executrix in the Probate court proceedings did not disclose the interest of defendant Weisberg in the subject matter of the complaint, and that the transfer of the one-fourth share of the property involved from McLennan to defendant Weisberg was not founded upon any lawful or valid consideration and was without consideration. The respective answers of the two defendants denied, in substance, the alleged agreement between McLennan and plaintiff and denied that McLennan made the purchase of the interest in question from the First National Bank of Chicago pursuant to any agreement with plaintiff; denied that the said purchase was made for plaintiff's benefit; denied all of plaintiff's allegations as to the alleged lack of jurisdiction of the Probate court and Circuit court of the proceedings commenced by plaintiff in the Probate court. The answers of the two defendants also set up affirmative defenses, *viz., laches,* the five year Statute of Limitations and Section 70 of the Administration Act of Illinois; *allege that the principal matter in controversy in this case was adjudicated in the Circuit court proceedings, wherein it was determined that there was no agreement between plaintiff and McLennan and plaintiff's present claim is barred by the principle of res judicata and estoppel by verdict.* A motion by plaintiff to strike from the answers all of the special defenses set up therein was sustained. The cause was referred to a master in chancery, who filed a report in which he found that the material allegations of the complaint were established by the evidence and recommended that upon the payment by Goodman

of the sum of $4,000 "expended for such purchase" by McLennan, together with accrued interest thereon, defendants Katherine Howell McLennan Cushman, individually and as Executrix under the will of Hugh McLennan, deceased, and Albert J. Weisberg, as assignee from said McLennan of a part of the Goodman interest, execute an assignment to Goodman assigning to the latter such interest as Hugh McLennan had acquired by the assignment from the First National Bank of Chicago of the Goodman interest in the Chicago Produce District Trust (also referred to as South Water Market) and such part as had been assigned by McLennan to Weisberg. The master overruled all objections filed by defendants to his report and the trial court overruled defendants' exceptions to the master's report, approved the report *in toto,* and entered a decree in accordance with the recommendations of the master.

Five points are raised by defendants in support of their contention that the judgment in the instant case must be reversed, but in our view of this appeal we need pass upon only two of the points. They are (1): "The principal matter in controversy in this case between plaintiff and the defendant Katherine Howell McLennan Cushman having been adjudicated in a previous action, plaintiff is barred by the principle of *res judicata* from again bringing an action based upon the same material facts"; the Circuit court having determined in the prior action that there was no agreement between plaintiff and McLennan, plaintiff is now estopped by that judgment; and (2): Plaintiff was seeking to prove a constructive trust by parol evidence and he was required to prove the existence of the alleged contract by an extraordinary degree or certainty of proof, and that he entirely failed to establish the making of the alleged contract between plaintiff and McLennan by the requisite quantum of proof.

As to point (1): We have assumed for the purposes of this appeal that the executrix is the only defendant who has the right to interpose the defense of *res judicata*. It appears from our former opinion that the controlling fact at issue in the Circuit court proceeding was whether McLennan made the alleged agreement with Goodman to purchase the ''Goodman interest'' on the latter's behalf, and we stated that the jury did not believe petitioner's evidence as to the alleged agreement; that the trial court approved the jury's finding, and we approved the verdict of the jury and the judgment entered. In the instant proceeding plaintiff bases his claim upon the same alleged agreement that formed the basis of his claim in the Circuit court proceeding. The law bearing upon the principle of *res judicata* is well established. In the well-known case of *Hanna v. Read,* 102 Ill. 596, the court stated (pp. 602, 603):

'' . . . Where the former adjudication is relied on as an answer and bar to the whole cause of action, or, in other words, where it is claimed to be an answer to all the questions involved in the subsequent action, then it must appear, as claimed by defendants in error, that the cause of action and thing sought to be recovered are the same in both suits. The former adjudication in cases of this class is technically known as an estoppel by judgment, and the judgment itself is commonly characterized as a bar to the action; but where some specific fact or question has been adjudicated and determined in a former suit, and the same fact or question is again put in issue in a subsequent suit between the same parties, its determination in the former suit, if properly presented and relied on, will be held conclusive upon the parties in the latter suit, without regard to whether the cause of action is the same in both suits or not. This species of estoppel is known to the law as an estoppel by verdict, and is equally available to a plaintiff in support of his action,

when the circumstances warrant it, as when offered by a defendant as matter of defense. . . .

"Whether the adjudication relied on as an estoppel goes to a single question, or all the questions involved in a cause, the fundamental principle upon which it is allowed in either case is, that justice and public policy alike demand that a matter, whether consisting of one or many questions, which has been solemnly adjudicated by a court of competent jurisdiction, shall be deemed finally and conclusively settled in any subsequent litigation between the same parties, where the same question or questions arise, except where the litigation is a direct proceeding for the purpose of reversing or setting aside such adjudication.''

■■ Plaintiff does not question the rules of law laid down in the *Hanna* case, but he contends that the Probate court was without jurisdiction to hear and determine his petition and that the Circuit court in the *de novo* hearing could exercise only such jurisdiction as the Probate court had in the subject matter of the litigation and, therefore, the doctrine of *res judicata* cannot be interposed by defendants in the instant proceedings. Plaintiff argues that after Weisberg's testimony in the Circuit court proceedings disclosed fully his interest in the so-called Goodman interest it then became clear that the Probate court lacked the power to award the relief which plaintiff sought in his petition because the assignment by McLennan to Weisberg of a part of the so-called Goodman interest made Weisberg a necessary party in any proceeding to determine the ownership of said interest and the Probate court lacked authority to determine that the Goodman interest belonged to plaintiff as Weisberg's rights could not be adjudicated in the Probate court and, therefore, that court was without jurisdiction to pass upon plaintiff's petition. A pertinent question is at once presented: What was the attitude of plaintiff in the *de novo* trial in the Circuit court after Weis-

berg had testified? The record conclusively shows that he continued to vigorously prosecute the claim set up in the petition and he contended that he was entitled, *under the evidence and the law,* to have his claim allowed in that proceeding. After the jury had returned its verdict and the court had entered judgment upon the verdict, plaintiff filed a written motion to vacate the judgment entered and to set aside the verdict of the jury *and grant the petitioner a new trial.* In support of that motion plaintiff assigned twenty-six grounds, in none of which is there even a suggestion that the court lacked jurisdiction of the subject matter of the petition. The principal ground urged was that the verdict was contrary to the manifest weight of the evidence. Upon appeal to this court from the judgment of the Circuit court plaintiff contended, *inter alia,* that the verdict of the jury and the judgment of the Circuit court were against the manifest weight of the evidence and that the judgment of the Circuit court should be reversed, and *that we should enter judgment for plaintiff upon the record.* We are justified in assuming that plaintiff's petition for leave to appeal to the Supreme court did not question the jurisdiction of the Probate court nor the Circuit court to pass upon his claim. We prefer to assume that the instant contention of plaintiff is a belated afterthought, because if Weisberg's testimony made it plain to plaintiff that the Circuit court was without jurisdiction to entertain plaintiff's claim, *as the latter now argues,* then we must conclude that plaintiff gambled that he might have his claim allowed in the Circuit court, Appellate court, or Supreme court. That the contention of defendant executrix, strenuously argued, that plaintiff, under the record, is estopped from questioning the jurisdiction of the Probate court or the Circuit court in the present collateral proceedings, is not without some force, see *Hopkins v. Gifford,* 309 Ill. 363, 370. However, the Probate court,

in our judgment, had full jurisdiction to hear and determine the petition of plaintiff. That court has exclusive jurisdiction over all claims against estates save those arising from tort (*Howard v. Swift,* 356 Ill. 80; *Gordon v. Bauer,* 373 Ill. 357), and while it could not afford plaintiff any relief against Weisberg, it had full jurisdiction of plaintiff's petition against the executrix, which sought to reach assets in the possession of the executrix. While the petition claimed the entire Goodman interest, it would function, of course, as a claim for whatever portion of the Goodman interest Hugh McLennan possessed at his death and that was in the possession of the executrix. If the executrix had filed a plea to the petition of plaintiff that McLennan had parted with a certain portion of the so-called Goodman interest before his death and that therefore the Probate court was without jurisdiction to hear and determine the petition of plaintiff, such a plea would not receive serious consideration. Plaintiff argues that the so-called Goodman interest was indivisible, and, therefore, Weisberg was a necessary party in any proceeding to determine the ownership of the so-called Goodman interest; that the Probate court is a "dead man's court," a "court of limited and special jurisdiction," and was without jurisdiction to determine the ownership of the same.

Counsel for plaintiff misconceives the nature and scope of the jurisdiction of the Probate court in passing upon claims against estates. The case of *In re Estate of Cunningham,* 324 Ill. App. 210, was heard by this Division of the court. There the subject of the jurisdiction of the Probate court in passing upon claims was exhaustively argued by able lawyers. In our opinion we stated (pp. 218, 219):

"In *Trego v. Estate of Cunningham,* 267 Ill. 367, 374, the court said: 'To avoid the delay, expense and embarrassment in the settlement of estates by requiring a resort, in the first place, to a court of equity, it

will proceed in a case of an equitable character as though a bill in chancery has been filed, and will hear the evidence, investigate the claim and apply equitable rules in determining the judgment. (*Moore v. Rogers,* 19 Ill. 347; *Dixon v. Buell,* 21 id. 203; *Heward v. Slagle,* 52 id. 336; *Wadsworth v. Connell,* 104 id. 369; *Thomson v. Black,* 200 id. 465.) In such a case the court will act substantially as a court of equity, disregarding mere matters of form and looking to the substance to determine the equities of the parties.' As stated by Mr. Presiding Justice WILSON in *In re Estate of Kinsey,* 261 Ill. App. 481, 487, 488: 'Numerous decisions of this State have recognized the rule that probate courts have equitable jurisdiction in matters pertaining to the administration of estates. *Wadsworth v. Connell,* 104 Ill. 369; *Shepard v. Speer,* 140 Ill. 238; *In re Estate of Mertz,* 246 Ill. App. 283; *Trego v. Estate of Cunningham,* 267 Ill. 367.' "

The Supreme court denied a petition for appeal in that case (388 Ill. 625). The fact that Weisberg could not be made a party in the Probate court proceedings did not affect the jurisdiction of the court to hear and determine the claim of plaintiff against the Estate. In passing upon that claim the Probate court had the power to hear evidence and determine the ownership of the so-called Goodman interest, and in determining that question it acted "substantially as a court of equity." While the judgment of that court, if plaintiff prevailed, would be effective only as to the portion of the so-called Goodman interest that McLennan possessed at his death and that was in the hands of the executrix, plaintiff also had a right to proceed against Weisberg in another forum to recover the portion of the so-called Goodman interest that had been assigned to Weisberg. In our judgment the trial court committed reversible error in striking from the answer of the executrix the defense of *res judicata.* But even if there was merit in plaintiff's contention

that the defense of *res judicata* cannot be interposed in the instant proceedings that fact would avail plaintiff nothing, as we are convinced that we must hold that the next contention of defendants is a meritorious one and that holding determines this appeal.

The contention of defendants is that plaintiff failed to establish the making of the alleged contract between plaintiff and Hugh McLennan by the requisite quantum of proof. The law bearing upon the instant contention is so well established that we need not cite again the cases that we cited in our former opinion. Plaintiff does not question the law but insists that "the record establishes by clear, convincing, unequivocal and satisfactory testimony that McLennan purchased the Goodman interest as plaintiff's agent." In the trial of the Circuit court proceeding the only evidence offered by plaintiff to prove the alleged oral contract between him and McLennan was the testimony of Grace Burke, Edward L. Schoen and Samuel Lederer. In the instant proceedings the only evidence offered to prove the alleged agreement was the testimony of Grace Burke and Edward L. Schoen. Before commenting upon the testimony of these two witnesses we deem it advisable to refer to certain facts and circumstances in evidence that throw light upon the alleged agreement:

The evidence shows that McLennan had owned substantial interests in the South Water Market for a number of years, that he continued to acquire additional interests therein from time to time, and stated that he wished to acquire control of the Market. The First National Bank, the owner of the Goodman interest, was anxious to dispose of it and for several years was willing to sell the interest to anybody who would pay the requested price. The Bank knew that McLennan owned substantial interests in the Chicago Produce District Trust and Thomas G. Johnson, a vice president of the Bank, testified that he negotiated with

McLennan for a period of almost two years before he finally induced McLennan to purchase the Goodman interest in June, 1938. Finally McLennan made an offer to buy the interest for $4,000 and Johnson accepted the offer. McLennan paid $1,000 in cash and gave his note for the balance, payable in six months. The note was not paid in full when it became due, but it was partly paid and renewed, and McLennan paid it in full on March 25, 1939. McLennan purchased the Goodman interest in his own name, received the certificates for the same, and always exercised acts of ownership as to them—save as to the interest that he assigned to Weisberg—and he made statements that he had purchased the said interest for his own benefit. McLennan lived for eighteen months after the alleged agreement with plaintiff was made, but there is not a fact or circumstance in evidence to show that Goodman ever inquired of McLennan during the said period of time whether he had made a deal with the Bank to purchase the securities. Plaintiff alleges in his complaint that McLennan had represented to him during the eighteen months' period that he was attempting to purchase the securities, but there is no evidence to sustain that allegation. When McLennan died, on September 5, 1939, his widow was appointed by the Probate court executrix of his estate and she filed an inventory in which she listed as an asset of the Estate the Goodman interest. Plaintiff's testimony shows that he made no inquiries to find out whether McLennan had purchased the Goodman interest until twelve months after McLennan's death, when he telephoned Charles Aaron, the attorney for the First National Bank of Chicago, in September, 1940, and asked him to find out what the Bank would take for his interest in the South Water Market. Aaron informed him that the Bank had sold the Goodman interest to McLennan, but it does not appear from Goodman's testimony that he made any mention to Aaron of the alleged agree-

ment.  As we stated in our former opinion: "It would appear from petitioner's testimony that when he spoke to Mr. Aaron he did not have in mind the alleged agreement that he claims he had with McLennan in reference to the securities."  In viewing plaintiff's conduct after the death of McLennan it must be remembered that he had no writing of any kind to support his claim, and that ordinary care and caution required that he ascertain quickly the status of the Goodman interest, yet, he waited for more than twelve months after the death of McLennan before he made any inquiries of the Bank as to the Goodman interest.

In our former opinion, in commenting upon the testimony of Mrs. Burke, we stated: "If we were to assume the truth of her testimony as to what occurred at the time and place in question, nevertheless, it fails to show any acceptance by Goodman of the alleged offer made by McLennan or any promise by Goodman that he would try to settle the Weintraub case."  In the instant trial Mrs. Burke added to the testimony that she gave in the Circuit court the following: "Mr. Goodman said, 'I will be willing to pay three or four or five thousand dollars, but I would like to get it as cheaply as possible.'  Mr. McLennan said, 'All right, I will go to the bank and I will get your interest for you, and when I get it, I will bring it back to you.'  So Mr. Goodman said he would work with Sam Gurman; that he did not know what results would come, but he wanted it understood that it would not interfere with Mr. McLennan getting his interest and delivering it to him.  Mr. McLennan said he was perfectly willing to do it.  He said he would do it."  The purpose of this additional testimony is obvious.  In the Circuit court trial Mrs. Burke testified that plaintiff first spoke to her about the conversation in August or September, 1940, and that "she had discussed with Goodman that talk eight or ten times, maybe a dozen times."  It is clear, therefore, that she thoroughly

refreshed her memory as to the alleged conversation before she testified in the Circuit court, and in that hearing she testified, in response to a question by plaintiff's counsel, that she had stated all that she could remember of the conversation. To explain the fact that she was giving important additional evidence in the instant proceeding as to the conversation, she testified that her recollection of the conversation upon the trial in the Superior court (in 1946) was more accurate than it was when she testified in the Circuit court (in 1941). She further testified that she had never seen McLennan prior to the time of the alleged conversation and that when he came into plaintiff's office he did not announce himself or state what his name was; that plaintiff and McLennan greeted each other as follows: ''Hello, Ben,'' and ''Hello, Mac''; that plaintiff did not say that the caller was Hugh McLennan but that she knew he was Hugh McLennan because *''I knew that Mr. Goodman didn't know anybody else called Mac except Hugh McLennan.''* After plaintiff closed his proof in the instant proceedings he reopened his proof and again put Mrs. Burke upon the stand. After introducing a group photograph of McLennan and other persons that was taken some thirteen years prior to the time that the witness was testifying, Mrs. Burke, after examining the photograph, identified the person in the picture (admitted to be McLennan) as the man who had the conversation with plaintiff; she further stated that at the time of the conversation *''he was* a little older, *a little heavier, a little fuller of face,* but I think just as good looking as he is on that picture, when I saw him.''* Defendants then offered evidence that McLennan looked and acted as an old man in February, 1938; that he was in a hospital in December, 1937, and January, 1938; that he was thinner and generally walked with a cane or walked with Otto Kretzer, who was closely associated with him in business. Kretzer's secretary testified that there was so

438

much difference in the appearance of McLennan in the picture and his appearance in 1938 that if she ''had not seen that picture before, and been advised that that was Mr. McLennan, I could not have identified him from that picture.'' After a careful consideration of the testimony of Mrs. Burke in the instant proceeding, viewed in the light of her testimony in the Circuit court proceeding, we are satisfied that she was willing to testify to anything that she thought would help to make out a case for plaintiff. The contention of defendants that her testimony as to the alleged agreement is a pure fabrication is fully justified by the record. Edward L. Schoen, called by plaintiff in the instant proceedings, also testified in the Circuit court trial. In our former opinion we stated that his testimony as to the alleged agreement was uncertain and indefinite as to its terms. That statement is also applicable to his testimony in the instant proceeding. Moreover, a certain part of his evidence in the instant proceeding seriously affects the weight of his testimony as to the alleged conversation on Michigan avenue. He testified, in the instant proceedings, that the conversation took place in the late summer or early fall of 1938, but upon redirect examination of the witness by plaintiff's counsel the following occurred: ''Mr. Davis: Q. Mr. Schoen, is there anything that you recollect that fixes in your mind now that the meeting between yourself, Sam Lederer, Goodman and McLennan took place in the late summer or early fall of 1938? A. No. Q. Any occurrence, incident or happening? A. Well, it was around that time. That was a big event. That was when Roosevelt made his quarantine speech on the bridge. I remember it was about the time, the time the bridge was opened *in 1938*.'' Defendants then offered evidence that proves conclusively that the opening of the Outer Drive bridge, upon which occasion President Roosevelt made his famous quarantine speech, occurred *October 5, 1937*.

According to Mrs. Burke's testimony the alleged contract between McLennan and plaintiff was made in February, 1938, or the early spring of 1938. In our former opinion we stated: ''Grace Burke testified that the McLennan conversation in petitioner's office took place in the early spring of 1938. Her testimony is susceptible of but one interpretation, *viz.*, that McLennan then made, for the first time, his offer to Goodman.'' The complaint alleges that the agreement was made in March, 1938, and the master found that it was made in the latter part of February, 1938. Schoen's testimony that the conversation occurred about the time the bridge was opened and President Roosevelt made his quarantine speech runs counter to plaintiff's theory of fact that McLennan first made his offer to plaintiff in the conversation between plaintiff and McLennan that Mrs. Burke relates in her testimony. After a careful consideration of the entire testimony bearing upon the subject we are satisfied that the claim of plaintiff was conceived some time after the death of McLennan. In our opinion, the proof offered by plaintiff in the instant proceeding in support of the alleged agreement was weaker than the evidence he introduced in the Circuit court proceeding in support of it. It is our considered judgment that no estate would be safe if claims like the instant one were allowed. If our conclusion as to the alleged agreement is sound plaintiff's claim necessarily falls as to both defendants, for the reason that the basis of his claim as to both defendants is the alleged agreement.

The decretal judgment entered by the Superior court of Cook county on July 3, 1946, is reversed *in toto.*

*Decretal judgment entered July 3, 1946, reversed in toto.*

FRIEND, P. J., and SULLIVAN, J., concur.